UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

ISABEL MOORE,                                )
                                             )
            Plaintiff,                       )
                                             )        Civil Action No. 11-cv-11936-DJC
            v.                               )
                                             )
MICHAEL J. ASTRUE, COMMISSIONER,             )
SOCIAL SECURITY ADMINISTRATION,              )
                                             )
            Defendant.                       )
_____)

MEMORANDUM AND ORDER

CASPER, J.

March 2, 2013

I.      Introduction

        Plaintiff Isabel Moore ("Moore") filed claims for disability insurance benefits ("SSDI")

and supplemental security income ("SSI") with the Social Security Administration ("SSA").

Pursuant to the procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3),

Moore brings this action for judicial review of the final decision of Defendant Michael J. Astrue,

Commissioner of the SSA ("the Commissioner"), issued by an Administrative Law Judge

("ALJ") on April 26, 2011, denying Moore's claims.  Before the Court are Moore's motions to

amend the administrative record before this Court and to reverse the ALJ's decision and the

Commissioner's motion to affirm that decision.  D. 14, 15, 19.  Moore argues that the Appeals

Council ("AC") should have considered the medical records she submitted after the ALJ's

decision and the Court should remand her claims to the ALJ for consideration of the medical records.  Furthermore, Moore argues that the ALJ erred in denying her claims because:  (1) there was no medical opinion that specifically supported the ALJ's conclusion and (2) Moore's complaints of pain were not fully addressed in accordance with 20 C.F.R. §§ 404.1529(c) and 416.929(c).  For the reasons stated below, the Court GRANTS the Commissioner's motion to affirm and DENIES Moore's motions to amend the record and reverse and remand.

## II.     Factual Background

Moore was thirty-seven years old when she ceased working in July of 2009.  R. 40.[1]  She had previously held jobs in the customer service industry as a temporary secretary, an office manager and a paralegal.  R. 40–42, 62–63.  In her July 22, 2009 application for SSDI and SSI with the SSA, Moore alleged disability due to a "disabling condition" that rendered her unable to work.  R. 128.  Specifically, Moore claimed that sarcoidosis and major depressive disorder limited her ability to work.  R. 146.

## III.    Procedural Background

Moore filed claims for SSDI and SSI with the SSA on July 22, 2009 asserting that she was unable to work as of July 22, 2009.  R. 128.  After initial review, her claims were denied on December 15, 2009.  R. 77.  Her claims were reviewed by a Federal Reviewing Official and again denied on July 16, 2010.  R. 84.  On July 22, 2010, Moore filed a timely request for a hearing before an ALJ pursuant to SSA regulations.  R. 89–90.  A hearing was held before an ALJ on April 14, 2011.  R. 32–74.  In a written decision dated April 26, 2011, the ALJ found that Moore did not have a disability within the definition of the Social Security Act and denied her

---

[1] "R." refers to the administrative record that is filed at D. 10.

2

claims.  R. 25.

On April 26, 2011, Moore was notified that the Decision Review Board (the "Board") had selected her claims for review.  R. 10.  On May 7, 2011, Moore sent the Board additional medical records from Boston Medical Center containing information pertaining to an upcoming superficial parotidectomy surgery on May 20, 2011 requesting that the Board include it in its administrative record.        D. 14-3 at 2, 8–28.  On May 22, 2011, the Board transferred review of Moore's claim to the AC and notified Moore that the AC would treat her case as if she "had filed a request for review of the hearing decision on the date of the notice advising [her] that the [Board] selected [her] case for review" and that it would be deemed a request for review.  R. 7. The notice also informed Moore that the AC's decision whether to grant Moore review would be based on the evidence "that was before the ALJ," except for the limited exceptions under 20 C.F.R. § 405.401(c).  R. 8; see 20 C.F.R. § 405.360 ("Subject to § 405.401(c), the official record closes once the administrative law judge issues his or her decision regardless of whether it becomes our final decision").  On May 26, 2011, Moore sent the Board the medical records from the superficial parotidectomy requesting that they be added to the administrative record.  D. 14-5 at 2–24.   On September 8, 2011, the AC denied Moore's request for review of the ALJ's decision.  R. 1.  Accordingly, the ALJ's decision is the Commissioner's final decision.

IV.     **Discussion**

      A.     <u>**Legal Standards**</u>

            *1.*     *Entitlement to Disability Benefits and Supplemental Security Income*

A claimant's entitlement to SSDI and SSI turns in part on whether she has a "disability," defined in the Social Security context as an "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §§ 416(i)(1)(A); <u>see also</u> 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505.  The inability must be severe, rendering the claimant unable to do her previous work and any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511.

The Commissioner must follow a five-step process when determining whether an individual has a disability for Social Security purposes and, thus, whether that individual's application for benefits will be granted.  20 C.F.R. § 416.920.  All five steps are not applied to every applicant; the determination may be concluded at any step along the process.  <u>Id.</u>  First, if the applicant is engaged in substantial gainful work activity, then the application is denied.  <u>Id.</u> Second, if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, then the application is denied.  <u>Id.</u>  Third, if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted.  <u>Id.</u>  Fourth, if the applicant's "residual functional capacity" ("RFC") is such that he or she can still perform past relevant work, then the application is denied.  <u>Id.</u>  Fifth and finally, if the applicant, given his or her RFC, education, work experience and age is unable to do any other work within the national economy the application is granted.  <u>Id.</u>

2.   *Standard of Review*

This Court has the power to affirm, modify, or reverse a decision of the Commissioner. 42 U.S.C. § 405(g).  Such review is "limited to determining whether the ALJ used the proper

legal standards and found facts upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000) (citing Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999)). The ALJ's findings of fact are conclusive when supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)) (internal quotation mark omitted).

However, the ALJ's findings of fact "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen, 172 F.3d at 35 (citations omitted). Thus, if the ALJ made a legal or factual error, Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (citation omitted), the Court may reverse or remand such decision to consider new material evidence or to apply the correct legal standard. See 42 U.S.C. § 405(g).

**B.** **Before the ALJ**

*1.* *Medical History*

There was extensive evidence about Moore's medical history before the ALJ, particularly in regard to Moore's sarcoidosis, bipolar disorder and left side parotitis conditions.

a. Drug Addiction

In 2000 and 2001, Moore had a heroin dependency for approximately nine months. R. 36, 321, 734, 960. However, Moore has not used drugs for more than ten years and her heroin dependency has been described as in "full sustained remission" since the onset of her alleged

disability.  R. 323, 412, 736, 749, 761, 960, 1022, 1032.

        b.        Left sided Parotitis/Sarcoidosis

Moore has a history of recurrent left side parotitis[2] which has consisted of facial pain and swelling.  R. 959.  Prior to April 2007, antibiotics worked to treat Moore's symptoms and all tests including CT, MRI and sialogram (an x-ray of the salivary glands) were negative.  R. 866, 959, 962.  In April 2007, Moore saw Dr. Shruti Wilson at Boston Medical Center and complained of facial pain on her left side, swelling, fevers and chills and reported that the symptoms had been occurring twice a month for the past year.  R. 959.  Moore appeared anxious and stated that Tylenol was not helping to relieve her pain.  R. 959.  She had scheduled a parotid gland biopsy with Dr. John Stram, an ear, nose and throat ("ENT") specialist, for April 16, 2007.  R. 959.  The biopsy revealed that Moore had sarcoidosis[3] of her left parotid gland.  R. 343.  Moore underwent various treatments to reduce the symptoms associated with her sarcoidosis.  In April 2007, she was prescribed Medrol for a month; in June 2007, doctors prescribed Moore a daily dose of Prednisone.  R. 399, 455, 536, 871.  In December 2007, doctors started Moore on Methotrexate, which she took once a week.  R. 399, 536, 620, 625.  The Methotrexate provided good control of Moore's symptoms with the exception of mild parotid area pain and some

---

    [2] Parotitis is a salivary gland infection that consists of the inflammation of one or more parotid glands.  Parotid glands are located in each cheek over the jaw in front of the ears. Salivary Gland Infections, National Center for Biotechnology Information, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002036/ (last visited February 12, 2013).

    [3] Sarcoidosis is a disease of unknown origin that leads to inflammation and can affect any organ in the body, although, it usually starts in the lungs, skin, and/or lymph nodes.  The immune system cells in people with sarcoidosis cluster to form lumps called granulomas in various organs of the body.  Signs and symptoms as well as treatment vary depending on which organs are affected. What Is Sarcoidosis?, National Heart Lung and Blood Institute: People Science Health, http://www.nhlbi.nih.gov/health/health-topics/topics/sarc/ (last visited February 12, 2013).

complaints of diarrhea.  R. 399, 611, 627, 870, 948, 953.  Sometime between May 7, 2008 and July 23, 2008, Moore, on her own, stopped taking Prednisone due to an alleged sensation of dyspnea.  R. 403, 455, 536, 620–21, 625, 870, 900.  However, Moore continued the weekly Methotrexate treatment and had "good control of parotid swelling and pain."  R. 384.  After completing the year-long Methotrexate treatment, Moore gradually stopped taking it in February 2009 and began to experience discomfort in her left parotid gland and increased saliva from the left side of her mouth.  R. 384.  Dr. Darrell Kotton of Boston Medical Center reported that "[i]t [was] unclear whether [Moore] [was] adjusting (mentally and physically) to being off methotrexate for the past 2 weeks, or whether she [was] having a relapse of sarcoidosis."  R. 388. Moore started on Botox injections for her increased saliva and monitored her parotid discomfort and swelling.  R. 388.

On August 13, 2009, Moore visited the Boston Medical Center's emergency room and complained of night fevers and facial pain on her right side.  R. 823–24.  In an October 2009 report from Moore's primary care physician, Dr. Renee McKinney, it was reported that Moore was also given a course of Dexametasone injections to relieve pain, but they were ineffective. R. 463, 517.  Moore reported having pain near the outside of her left ear and feeling nodules in the back of her head.  R. 460.  Moore reported that the pain was daily and Amitrtytline helped with her pain at night.  R. 460.  By November 2009, after a hospitalization, Moore stopped taking all of her prescribed medication and experienced a symptom-free period during which time her pain and other symptoms completely resolved, which Moore attributed to her "recent conversion to Christian faith."  R. 442, 536, 540, 550, 766, 792.

Moore started experiencing problems with her left parotid gland again in late February

2010.  R. 783.  She was given a refill of Ibuprofen and Percocet to use at night, but the pain

persisted.  R. 787.  In January 2011, Moore reported that the pain on the left side of her face was

worsening.  R. 899.  In February 2011, Dr. McKinney sought additional guidance for Moore's

facial pain, writing, "[Moore] has seen multiple specialists for it over the last 3 years and I am at

a loss for how to explain or treat it."  R. 1058.  Moore described the pain as a "sharp burning

pain which is focal on the left side of her face.  It does not radiate, and has no exacerbating,

allevaiting [sic] factors."      R. 1053.  Moore received steroid nerve block injections and

Ibuprofen to relieve her facial pain, but still complained of face, head and cheek pain.  R. 1026,

1036, 1050.

On April 12, 2011, Moore had a MRI of her neck to address her left parotid gland pain

and recurrent swelling.  R. 1092.  The MRI revealed that Moore had a "stable 9 mm nodule

consistent with a lymph node within the superficial lobe of the left parotid gland [and] a nodule

in a similar location in the right parotid gland, also stable."  R. 1092.  The nodule appeared stable

since 2004 and appeared to be an intraparotid lymph node.  R. 1093.  The MRI also revealed "no

cervical lymphadenopathy."  R. 1092.

c.      Bipolar Disorder/Depression

Moore has a family history of mental illness and since childhood has dealt with

depression.  R. 407–08.  Moore's mother had a severe mental illness and was in and out of the

Lindemann Mental Health Center.  R. 407, 733.  As a result of her mother's mental illness,

Moore was placed in a foster home and at the age of eight, Moore was raped while there.  R. 408.

At age fourteen, Moore was hospitalized after consuming pills and alcohol in an attempt to

commit suicide.  R. 408.  Moore has seen psychiatrists and psychologists from time to time to

deal with her depression and Dr. Kathleen Silva, a licensed psychologist from UMASS Disability Evaluation Service, diagnosed Moore with bipolar disorder and gave her a Global Assessment of Functioning ("GAF") score of 54, indicating that at the time of the evaluation Moore had moderate symptoms or moderate difficulty in social, occupational or school functioning.  R. 323.  In addition to Dr. Silva, there were several other clinicians who diagnosed Moore as bipolar and/or rated her functioning between 45 and 60 on the GAF scale.  R. 412, 736, 789, 1022.  At times, Moore reported that she was depressed, but did not want any medication. R. 582.  Moore took Prozac, but stopped because it increased her anger.  R. 775.  Moore was prescribed Zoloft, which was effective.  R. 408–409, 411, 1020.  However, Moore stopped taking Zoloft because it made her sweat and was allegedly interfering with her doctors' ability to "sort out her medical condition."  R. 408–409, 411.  Moore stopped seeing her therapist Dr. Judith Bello in November 2010, whom she had seen on and off since 2003.  R. 49–52.

  *2.*  *ALJ Hearing*

    At the administrative hearing on April 14, 2011, the ALJ heard testimony from Moore and a vocational expert ("VE").  R. 32–74.

    a.  Moore's Testimony

    Moore testified that she was 38 years old, attended school through the tenth grade and last worked in July 2009.  R. 40.  She noted that she could not work due to an "unknown infection" that caused "fevers, diarrhea [and] swellingness" and due to an unknown pain in her parotid gland, where she has nodules, R. 58–59, but she later learned that she had sarcoidosis.  R. 43.  Moore explained that she had been in a lot of pain for the last six months and that the problem was with her left parotid gland and the pain on the back of her head, which was "still

unknown." R. 59. Moore testified that she was taking Percocet for pain and was being treated by Dr. Stram with cortisone shots in her face and also receiving treatments from Dr. James Otis, a neurologist, in the back of her head. R. 59.

Moore testified that she cared for her schizophrenic husband who, due to his condition, has been receiving Social Security benefits for about a year. R. 44–45, 48–49. She helps her husband remember to take his medicine, is in regular contact with his doctors and travels with him to his weekly appointments. R. 48–49, 53–54. Moore testified that she has two daughters, ages twenty-two and seventeen. R. 45. Moore's younger daughter lives with her. R. 45. Moore's older daughter has two children, ages three and six months. R. 55. Moore testified that she babysits her grandchildren three to four times per month for a couple of hours. R. 55. Moore testified that she does not hold her six-month-old grandson that much because her left hand often goes limp. R. 57.

In regard to her daily activities, Moore stated that she is "always cleaning," likes to write, read and cook. R. 46–47. Moore testified that she walks about four minutes to the grocery store to go food shopping and then takes a cab home and that she usually takes public transportation to doctors' appointments. R. 46. Moore also testified that she can walk four blocks from her house to the train station, sit for forty-five minutes at a time and that she "really [doesn't] lift." R. 56–57.

Moore testified that in the past she had seen Dr. Bello for mental health treatment, but stopped because she was getting "too depressed." R. 49–50. She felt like she was "always at Boston Medical [Center]." R. 50. Moore testified that she last received mental health treatment in November of 2010, but prior to that she had been seeing Dr. Bello, on and off, since 2003. R.

50–52.

> b.    VE's Testimony

After hearing Moore's testimony, the ALJ presented a hypothetical to the VE.  In that hypothetical the VE was to assume a person of Moore's "age, education, and work experience, [that was] limited to the light range of work, as that term is defined under the Social Security regulations [and] frequently limited, in that this individual can only occasionally climb ramps or stairs, ladders, ropes, scaffolds; balance, stoop, kneel, crouch, or crawl."  R. 63.  This person was also further limited to sedentary work requiring only simple routine tasks; occasional decision-making and only occasional changes in the work setting.  R. 65.  This individual could also only handle occasional interaction with the public and, although the individual could work around co-workers throughout the day, he or she could only handle occasional interaction with co-workers.  R. 68.

The VE testified that someone with the characteristics of the hypothetical person could not work in Moore's past positions, but could perform sedentary factory work and simple machine tending jobs.  R. 65–67.  The VE also noted that these jobs are "rigid" with attendance and if someone was "consistently taking more than one day a month off, they would not be able to maintain employment."  R. 68.  Furthermore, if this individual's concentration was impaired such that she or he could not attend to simple tasks two-thirds of the day, then all jobs would be ruled out.  R. 69.

> 3.    *Findings of the ALJ*

Following the five-step process, 20 C.F.R. § 416.920, at step one, the ALJ found that Moore had not engaged in substantial gainful activity since July 22, 2009.  R. 15.  Moore does

not dispute the ALJ's finding at step one.

At step two, the ALJ found that Moore had the following severe impairments: sarcoidosis, left sided parotitis and bipolar disorder.  R. 15.  The ALJ also found that Moore had the following non-severe impairments:  heroin dependence in full and sustained remission, epilepsy, thyroid nodules, alopecia, leukocytosis, spinal scoliosis, anemia, coronary artery disease and back pain.  R. 16.  Moore does not dispute the ALJ's findings at step two.

At step three, the ALJ found that Moore did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1515, 404.1526) and that the severity of Moore's mental impairments did not meet or medically equal the criteria of Social Security listing 12.04 regarding affective disorders.  R. 16.  Under paragraph B of 12.04, a mental impairment must result in at least two of the following:  marked restriction on activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation.  20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.04.  The ALJ found that Moore had mild restrictions on daily activities and social functioning and moderate difficulties in concentration, pace and persistence and showed no signs of decompensation.  R. 17.  Moore does not dispute the ALJ's determination at step three.

Before reaching step four, the ALJ determined Moore's RFC, finding that Moore has the residual capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except that Moore could only occasionally climb, balance, stoop, kneel, crouch or crawl.  R. 18.  The ALJ also found that Moore would be limited to the performance of simple, routine tasks with only

occasional decision-making, occasional changes in the work setting and occasional interaction with co-workers and the general public. R. 18. On the basis of this RFC finding, at step four, the ALJ determined that Moore could not perform any of her past relevant work, characterized by the VE, as a customer service representative, a general office file clerk and a front office worker. R. 23. Moore disputes the RFC assessment.

At step five the ALJ found, relying upon the VE's testimony and considering Moore's age, education, work experience and RFC, that there were jobs that existed in significant numbers in the national economy that Moore could perform including factory production worker and machine tender. R. 24. Therefore, the ALJ concluded that Moore was not disabled from July 22, 2009 through the date of the ALJ's decision. R. 25. Moore disputes the ALJ's ultimate conclusion that she is not disabled.

C.      **Moore's Challenges to the ALJ's Findings**

Moore contends that the ALJ's RFC determination that she has the capacity to perform sedentary work with certain restrictions is not supported by substantial evidence. Specifically, she argues that the ALJ erred in two ways: first, by rendering an RFC determination that is inconsistent with the opinions of her treating physician Dr. Stram and unsupported by the medical opinions in the record and second, by finding Moore not fully credible with regard to her complaints of pain. Pl. Mem., D. 16 at 12–19.

1.      *The ALJ Did Not Err in her Analysis of the Medical Opinions*

Moore argues that the ALJ should have made an RFC determination consistent with treating physician Dr. Stram's March 23, 2011 opinion and that the ALJ erred by improperly evaluating other medical opinions in making her RFC determination. When determining

whether a person is disabled, the ALJ must consider all medical opinions together with other relevant evidence in the record.   20 C.F.R. § 416.927(b)-(c).   The ALJ is not "obligated automatically to accept [a treating physician's] conclusions." Guyton v. Apfel, 20 F. Supp. 2d 156, 167 (D. Mass. 1998).   A treating physician's opinion is given controlling weight if the "treating source's opinion on the issue(s) of the nature and severity of [the patient's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the case record. Makuch v. Halter, 170 F. Supp. 2d 117, 124–25 (D. Mass. 2001) (alterations in original) (quoting 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)).   When the treating physician's opinion is not given controlling weight, the ALJ must determine the amount of weight to be given to the opinion based on factors that include the length of the treatment relationship and the frequency of examination; the nature and extent of the treatment relationship; whether the treating physician provides evidence in support of the opinion; whether the opinion is consistent with the record as a whole; whether the physician is a specialist in the field; and any other relevant factors such as the extent to which the physician is familiar with the other information in the claimant's case record.   20 C.F.R. §§ 404.1527(c)(1)–(6), 416.927(d)(2).   Although an ALJ must provide "good reasons" in her opinion for the weight she assigns to a treating source, Gagnon v. Astrue, No. 11–CV–10481–PBS, 2012 WL 1065837, at *5 (D. Mass. Mar. 27, 2012) (quoting 20 C.F.R. § 404.1527(d)), the ultimate determination of disability is for the ALJ, not the treating physician(s), to decide.   20 C.F.R. § 404.1527(d)(1) (providing that "[a] statement by a medical source that [the claimant is] 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that [the claimant is] disabled").   The ALJ must also use these

factors to determine the weight given to any other medical opinion. 20 C.F.R. § 404.1527(c)(1)–(6).

The ALJ is also required to consider all of the medical evidence in the record when making her RFC determination. Id. § 416.927(c). An "ALJ can consider all the evidence without directly addressing in [her] written decision every piece of evidence submitted by a party." Ramos-Birola v. Astrue, No. 10–CV–12275–DJC, 2012 WL 4412938, at *20 (D. Mass. Sept. 24, 2012) (quoting N.L.R.B. v. Beverly Enters.–Mass., Inc., 174 F.3d 13, 26 (1st Cir. 1999) (internal quotation mark omitted)); see also Miller v. Astrue, No. 99–CV–12018–RBC, 2011 WL 2462473, at *11 (D. Mass. June16, 2011) (noting that "[t]here is no requirement that an ALJ discuss every bit of evidence in the record when penning [her] decision [and] [t]he failure to mention a particular record does not evince a failure to consider it"). As discussed below, the ALJ properly considered all of the medical evidence in the record and the factors when she determining Moore's RFC.

### a.     Dr. John Stram

The ALJ stated that she considered Dr. Stram's opinions and gave them "minimal probative weight" and listed her reasons for doing so, which are consistent with the factors outlined in 20 C.F.R. § 404.1527(c). R. 22. Dr. Stram was Moore's ENT specialist and was asked by Moore's attorney to complete a "Physical Residual Functional Capacity Questionnaire" and a "Clinical Assessment of Pain" based upon his treating relationship with Moore. R. 1025–30, 1034. Dr. Stram's March 23, 2011 "Clinical Assessment of Pain" states the following: "Pain is . . . [p]resent to such an extent as to be distracting to adequate performance of daily activities or work"; "Physical activity, such as walking, standing and bending . . . [d]oes not increase

pain"; "Medication impacts [Moore's] work ability to the extent that [the medication] will severely limit [Moore's] effectiveness in the work place due to distraction, inattention, drowsiness, etc."; and "[i]n a 20-day calendar month, [Moore] would miss approximately 10 days of work."  R. 1034.

First, the ALJ considered whether Dr. Stram offered any evidence to support his conclusion that Moore would require ten unscheduled absences each month and noted that Dr. Stram did not offer any evidence or additional explanation to support this conclusion.  R. 22, 1034.  Furthermore, the ALJ found that "no evidence contained in the record — including Dr. Stram's own treatment records — supports [this] far-reaching conclusion."  R. 22.  The ALJ also found that Dr. Stram's statement that "physical activities such as walking, standing, and bending do not increase [Moore's] pain" further weakened his conclusion.  R. 22.

Second, the ALJ considered the nature and extent of Dr. Stram's treatment relationship with Moore.  R. 22.  The ALJ considered Dr. Stram's March 23, 2011 "Physical Residual Functional Capacity Questionnaire" and noted that Dr. Stram failed to fill out the majority of the form and declined to answer questions regarding Moore's limitations during an eight-hour workday, indicating that it was "not [his] area of treatment" and directing the ALJ to Moore's primary care physician.  R. 22, 1028.  When determining how much weight to give Dr. Stram's opinions, the ALJ considered Dr. Stram's "admitted lack of familiarity with the claimant's abilities and limitations."  R. 22.  In light of the foregoing, the ALJ properly considered the relevant factors in determining to give "minimal probative weight" to Dr. Stram's March 2011 medical opinions.

b.      Dr. Asha Saxena

On February 26, 2010, Dr. Saxon met with Moore to conduct a disability evaluation.  R. 737.  Dr. Saxena opined that Moore could only walk for about one block, climb one flight of stairs and carry fifteen pounds of weight when "she is not having flare-up[s] of any conditions and is not having any severe side effects."  R. 741.  Dr. Saxena also concluded that Moore is able to perform her daily activities normally, but occasionally is unable to move at all when she has flare-ups.  R. 741.  The ALJ gave Dr. Saxena's opinion "minimal weight."  R. 22.

First, the ALJ considered the length of the treatment relationship and the frequency of examination and found that Dr. Saxena only had one visit with Moore and concluded that it did not place her in a "strong position to judge [Moore's] abilities and limitations."  R. 22.  Second, the ALJ considered the extent to which Dr. Saxena was familiar with the other information in Moore's record and found that not only did Dr. Saxena "not have access to a full longitudinal view of the medical evidence of record," but also that the opinion was inconsistent with the record, which "contains statements by [Moore] indicating that she is not as impaired as Dr. Saxena has indicated."  R. 22.  For example, the Court notes that Moore testified that she could walk four blocks, not one.  R. 56.  The ALJ, however, found that Dr. Saxena's opinion regarding Moore's ability to perform daily activities was supported by the record as a whole and concurred with this portion of Dr. Saxena's opinion.  R. 22.

c.      Dr. Karen Kurlander

On October 13, 2009, Dr. Karen Kurlander issued a "Consultative Examination Report" for the Massachusetts Rehabilitation Commission Disability Determination Services.  R. 406–12.  Dr. Kurlander opined that Moore is "able to walk, stand, lift, bend, and carry."  R. 411.  Dr. Kurlander also opined that Moore "is very likeable and does not in general seem to have trouble

getting along with people." R. 411. The ALJ gave this opinion "minimal weight." R. 22. The ALJ considered if the opinion conflicted with anything in the record and found that it did not. R. 22. However, the ALJ found this opinion to be "conclusory" and "somewhat outside the scope of [Dr. Kurlander's] expertise." R. 22. The ALJ discounted Dr. Kurlander's opinions about Moore's physical abilities because Dr. Kurlander had a lack of familiarity with sarcoidosis as indicated by her description of it as "something called sarcoid disease." R. 22–23, 406.

> d.     Dr. John Manuelian

Dr. Manuelian, a state agency medical consultant, completed a "Physical Residual Functional Capacity Assessment" on October 14, 2009. R. 413–420. Dr. Manuelian opined that Moore could lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk for about six hours in an eight-hour workday and sit (with normal breaks) for about six hours in an eight-hour workday. R. 414. He also noted that Moore could only occasionally climb, stoop, kneel, crouch or crawl, R. 415, and that she should avoid concentrated exposure to extreme temperatures, wetness, noise, vibration or hazards. R. 417. The ALJ gave Dr. Manuelian's opinion "minimal weight" finding that it was "not consistent with the record as a whole" and that there was evidence in the record to justify "significantly greater limitations than those contained in Dr. Manuelian's assessment." R. 23.

> e.     Dr. Joan Kellerman

Dr. Kellerman, another state agency consultant, completed a "Psychiatric Review Technique" form on November 21, 2009 and opined that although the alleged mental impairments were severe, they were not expected to last more than twelve months. R. 421. The ALJ also gave this opinion "minimal weight" because it was inconsistent with the evidence in

18

the record as there was sufficient medical evidence in the record to justify the finding that

Moore's mental impairments were severe and had lasted more than twelve months.  R. 23.

Moore argues that there is no one medical opinion to support the ALJ's RFC

determination, D. 16 at 13, however, this is not required.  The ALJ must consider the record as a

whole.  See Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 144 (1st Cir. 1987)

(concluding that "the notion that there must always be some super-evaluator, a single physician

who gives the factfinder an overview of the entire case is unsupported by the statutory scheme,

or by the caselaw, or by common sense, for that matter").  In making her RFC determination, the

ALJ properly evaluated the medical opinions in the record in accordance with the applicable

standards.

> 2.     *The ALJ Did Not Err by Ascribing Limited Credibility to Moore's*
> *Statements about the Intensity, Persistence and Limiting Effects of her*
> *Symptoms*

Moore argues that when assessing her credibility, the ALJ erred by not assigning more

credit to her claims concerning the intensity, persistence and limiting effects of her pain

symptoms as required by 20 C.F.R. §§ 404.1529(c), 416.929(c).  D. 16 at 15–18.  There is a two-

step process for evaluating the credibility of a claimant's statements about her symptoms, such as

pain.  SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996).  The ALJ must first "consider whether

there is an underlying medically determinable physical or mental impairment(s) . . . that could

reasonably be expected to produce the individual's pain or other symptoms."  Id.; see also

20 C.F.R. § 404.1529(b).  Here, the ALJ found that Moore's medically determinable mental and

physical impairments could reasonably be expected to cause her alleged symptoms.  R. 19.

If such an underlying impairment has been shown to exist, the ALJ moves to step two of

the credibility analysis.   20 C.F.R. § 404.1529(c).   The ALJ must "evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities."   SSR 96–7p, 1996 WL 374186, at *2.   If an individual's statements about her symptoms are not supported by objective medical evidence, the ALJ must determine the credibility of the individual's statements based on a consideration of the entire case record, including medical signs and laboratory findings, the individual's own statements, any statements or information provided by treating or examining physicians, psychologists and other persons about the symptoms and how they affect the individual and any other relevant evidence in the record.   SSR 96–7p, 1996 WL 374186, at *2. The ALJ's decision must provide "specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."   Id.   At step two of the credibility analysis, the ALJ found that Moore's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent that they were inconsistent with the ALJ's RFC assessment. R. 19.   The ALJ properly considered Moore's daily activities, frequency and intensity of symptoms, precipitating or aggravating factors, effectiveness or side effects of medications, the type of treatment prescribed for her and any functional restrictions placed on her when making this determination.   R. 19–22, 45–50; Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 22–23 (1st Cir. 1986); SSR 96–7p, 1996 WL 374186, at *3.

During the hearing, the ALJ asked Moore several questions regarding her daily activities. R. 46–48.   Moore testified that she is "always" cleaning.   R. 46.   She also stated that she cleans

over things "a lot of times over and over and over."  R. 46–47.  In making her credibility

determination, the ALJ stated that "[d]espite the claimant's allegations, [Moore] reports that she

is able to vigorously clean her entire home."  R. 21.  Moore objects to the ALJ's characterization

that she "vigorously clean[s] her entire home" in making her credibility determination.  D. 16 at

17.  While Moore correctly points out the word "vigorously" is not used anywhere in the record,

such a characterization is supported by the entirety of Moore's testimony and the evidence in the

record.  See, e.g., R. 46–47, 409.  Moore also testified at the hearing that she likes to write in her

journal, read and cook and that she babysits her grandchildren three to four times per month.  R.

47, 55.  She also testified about the care that she provides for her husband.  R. 48–49.  Based on

Moore's own testimony and other evidence in the record, the ALJ found that Moore could

perform her daily activities and noted in particular that Moore "appears to play a significant role

in caring for her disabled husband."  R. 21.  The ALJ concluded that "[w]hile [Moore] should be

lauded for her efforts . . . her ability to provide care for her disabled husband does not tend to

enhance the credibility of her allegations."  R. 21.  While the ability to perform daily activities

does not prove that a claimant is "not disabled," the ALJ may use evidence of performance of

daily activities to support a negative credibility finding.  Teixeira v. Astrue, 755 F. Supp. 2d 340,

347 (D. Mass. 2010) (determining that performance of household chores could be considered

when determining credibility) (citing Berrios Lopez v. Sec'y of Health & Human Servs., 951

F.2d 427, 429 (1st Cir. 1991) (finding complaints of pain not credible because claimant could

drive and walk without assistance)).

Moore argues that "[n]owhere in the record does the ALJ consider the side effects of

[Moore's] medication," D. 16 at 17, however the Court finds evidence to the contrary.

Regarding her symptoms relating to sarcoidosis, the ALJ noted that Moore experienced "problematic side effects on the steroid prednisone," that some medications were only minimally effective and that Moore experienced a "recurrence of fevers, painful lymphadenopathy with associated neck/head pain, and mild diarrhea" subsequent to stopping Doxycycline.  R. 19.  The Court notes that although Dr. Stram suggests that Moore's medication severely limited her "effectiveness in the work place due to distraction, inattention, drowsiness, etc.," there is nothing in the record to support his claim nor is there any specific mention of which medications cause such side effects.  R. 1034.  Moore also never points to a specific medicinal side effect that would limit her ability to work in her brief or in the record, nor did she mention during the hearing any specific medications with side effects that would limit her ability to work.  D. 16 at 17; R. 32–74.  Furthermore, "[d]rowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations," which this record does not.  See Caney v. Astrue, No. 11-CV-30245-KPN, 2012 WL 3151245, at *3 (D. Mass. Aug. 1, 2012) (alteration in original) (quoting Burns v. Barnhart, 312 F.3d 113, 132 (3rd Cir. 2002)) (internal quotation mark omitted)).  The ALJ also considered Moore's claim that she stopped taking Zoloft because it made her sweat.  R. 19.  Moore does not suggest to the Court, nor does the Court find, that the evidence in the record supports the conclusion that this side effect limited Moore's functional capacity.  See Caney, 2012 WL 3151245, at *3 (citing Webb v. Astrue, No. 31–CV–06057–MO, 2012 WL 1566230, at *2 (D. Or. May 2, 2012) (finding that the ALJ did not err in failing to consider a medication's side effects because the evidence did "not suggest any specific functional limitations the ALJ could have or should have incorporated into the RFC").  Accordingly, the Court finds that the ALJ properly considered

22

Moore's treatment and the effectiveness and side effects of Moore's medication.

### D.    <u>Amendment of the Administrative Record Was Not Warranted</u>

*1.    Standard of Review*

In general, the administrative record closes once the ALJ issues her decision, regardless of whether that decision becomes the SSA's final decision. <u>See</u> 20 C.F.R. § 405.360. The AC will consider additional evidence submitted after the ALJ's hearing decision "only where it relates to the period on or before the date of the [ALJ's] hearing decision, and only if [the claimant] show[s] that there is a reasonable probability that the evidence, alone or when considered with the other evidence of record, would change the outcome of the decision." 20 C.F.R. § 405.401(c).[4] Additionally, the claimant must show that the SSA's actions misled her; she had a physical, mental, educational or linguistic limitation(s) that prevented her from submitting the evidence earlier; or some other unusual, unexpected or unavoidable circumstance beyond the claimant's control prevented her from submitting the evidence earlier. 20 C.F.R § 405.401(c) (1)–(3). Unless this standard is met, the AC makes its decision on whether to grant review using solely the evidence that was before the ALJ. <u>See</u> 20 C.F.R. § 405.430.

*2.    Moore's Additional Evidence*

---

[4] This regulation was formerly named "Procedures before the Decision Review Board—general," but when the Board was dismantled in 2011, the SSA changed the name to "Appeals Council review." <u>See</u> <u>Eliminating the Decision Review Board</u>, 76 Fed. Reg. 24802–01, 2011 WL 1637614, at *24802–03 (May 3, 2011) (noting that the SSA was "eliminating the DRB and restoring the Boston region to most of the same rules and procedures at the Appeals Council level under parts 404 and 416 that [the SSA] currently follow[s] in the rest of the country" and "eliminating the rule that allowed an ALJ to consider new evidence and adding final section 405.401, which restricts the conditions under which the Appeals Council can accept new evidence in DSI claims").

On May 4, 2011, after the ALJ issued her decision, Moore's ENT specialist, Dr. Stram, informed Moore that she would have to undergo a superficial parotidectomy to remove the mass on her left side as steroid injections to that mass had been unsuccessful at relieving Moore's face and neck pain.  D. 14-3 at 9.  On May 7, 2011, Moore's lawyer sent Dr. Stram's assessment of Moore's condition along with Moore's Boston Medical records from March 31, 2011 to May 4, 2011, detailing how the injections were unsuccessful, to the Board noting that Moore's surgery could have "significant developments" and arguing that if the ALJ had this material in front of her during the hearing it may have changed her decision.  D. 14-3 at 2–3, 8–28.

On May 20, 2011, Moore was admitted to Boston Medical Center to undergo her superficial parotidectomy surgery.  D. 14-5 at 3.  On May 22, 2011, the AC sent Moore and her attorney a letter informing them that the Board had been eliminated and as a result her claim had been transferred to the AC.  R. 7.  On May 23, 2011, Moore was released from the hospital and on Thursday May 26, 2011, four days after receiving notice that Moore's case had been transferred, Moore's attorney sent the medical records pertaining to Moore's superficial parotidectomy and her three-day hospital stay at Boston Medical Center after the surgery to the Board.  D. 14-1 at 2; D. 14-5.

Moore's post-ALJ decision pre-operative pain assessment shows that prior to surgery Moore complained of a continuous, annoying, dull throbbing head pain that was being relieved by Oxycodone and had a pain level of eight out of ten.  D. 14-5 at 19.  Moore's pre-operative Braden analysis also shows that prior to surgery Moore could walk frequently and was "completely independent" in her activities of daily living.  D. 14-5 at 20.

Following surgery, Moore experienced acute pain and weakness on the left side of her face and was admitted to the hospital for pain control and monitoring of drain output. D. 14-5 at 5, 14, 22. A May 21, 2011 progress note reported that Moore complained of pain on the left side of her neck at a level nine out of ten and the left side of Moore's neck was tender to the touch. D. 14-5 at 15. Doctors gave Moore Oxycodone and Tylenol for pain control. D. 14-5 at 15. On the day of Moore's discharge, May 23, 2011, Dr. Stram reported that Moore was "in good condition, tolerating a diet and pain was controlled with oral pain medications." D. 14-5 at 5. The discharge report also showed that Moore was scheduled for a follow-up visit with Dr. Stram on June 6, 2011. D. 14-5 at 4.

3.      *Analysis*

Moore contends that the ALJ based her RFC assessment on evidence that Moore was treating her physical medical conditions conservatively; that shortly after the hearing and within days of receiving the ALJ's decision the treatment for Moore's condition changed significantly and became invasive in nature; that the change in Moore's treatment suggests that Dr. Stram's opinions should have been allotted more weight; and that since there is "no indication in the Notice of Appeals Council Action that this new evidence was rejected because it did not meet the requirements set out for submission of evidence to the Board. . . . remand is appropriate so that this analysis can be conducted and the analysis and review of this evidence is most appropriate by the ALJ." D. 14 ¶¶ 8–9; D. 16 at 11–12. Moore also argues that her post-ALJ decision treatment and hospitalization justify remand because there is a reasonable probability that the new evidence would change the outcome of the decision and that she could not submit this evidence earlier because it was not contemplated at the time of the hearing, but occurred very

shortly thereafter and relates to the time period at issue.  D. 14 ¶ 4; D. 16 at 11–12.  The Court

rejects Moore's arguments for the reasons provided below.

As an initial matter, it cannot be said that the entirety of the new medical records

submitted by Shaw, dated between March 31, 2011 and May 23, 2011, D. 14-3 and 14-5, relate

to the period on or before the date of the April 26, 2011 ALJ decision.  Although some of them

pre-date the April 26th date, the crux of Moore's argument rests upon those records relating to the

scheduling, execution and aftermath of her May 20, 2011 surgery.  Moreover, although these

latter records recite some of Moore's medical history, see D. 14-3 at 10, they do not contain any

retrospective analysis of her condition during the relevant time period between July 22, 2009 and

April 26, 2011.

But even assuming *arguendo* that all of the medical records that Moore proffered relate to

the relevant time period, she has failed to show that there is a reasonable probability that any of

this evidence would have changed the outcome of the ALJ's decision.  The ALJ noted the

following in her decision:

> The record contains evidence of varied symptoms presenting on an intermittent
> basis:  at times, [Moore's] symptoms have required hospitalization, and at other
> times, she has presented to treating physicians as essentially asymptomatic[.]
> However, even when her symptoms have appeared to flare up, the medical
> evidence of record does not indicate that they would preclude her from
> performing work within the residual functional capacity assessment outlined
> above.

R. 20.  The ALJ also noted that although Moore was treating her symptoms from sarcoidosis and

parotitis with nerve block injections and Ibuprofen, "her symptoms have continued to flare up on

an intermittent basis."  R. 19.  During the hearing, Moore's attorney also stated that Moore was

going to "continue to have testing and whatnot to see why she's having the facial pain and the

neck pain and what they might do for further treatment of that." R. 36. Accordingly, Moore's evidence regarding her post-ALJ decision treatment and hospitalization are cumulative of the evidence regarding Moore's diagnosis and treatment that was already in the record. The ALJ knew and considered that Moore's treatment presented varying degrees of relief and still found that there was substantial evidence in the record to support the conclusion that there was substantial gainful activity in the national economy that Moore could perform. R. 20. Furthermore, the treatment of Moore's condition did not change. The evidence that was before the ALJ demonstrated that Moore's doctors' method of treatment varied and at times required hospitalization. R. 536, 550. Therefore, the additional evidence does not show any change in Moore's treatment.

Finally, there is nothing in Moore's evidence regarding her post-ALJ decision treatment and hospitalization to suggest that the ALJ would have given Dr. Stram's opinion more weight if the evidence were before her prior to rendering her decision. When deciding the weight to give Dr. Stram's opinion, the ALJ noted that Dr. Stram declined to fill out most of the RFC form for Moore stating that it was not his "area of treatment," and found that Dr. Stram's opinion that Moore would require ten unscheduled absences each month was not supported by any other evidence in the record. R. 22. It is unlikely that evidence of an operation that removed the mass that was causing her symptoms and a post-surgery assessment that she was in "good condition" would provide such support. R. 22; D. 14-5 at 5.[5] For all of these reasons, Moore has failed to

---

[5]Having concluded that Moore has failed to show a reasonable probability that this new evidence would have changed the outcome of the ALJ's decision, the Court need not reach whether Moore has also shown, as she must under 20 C.F.R § 405.401(c) (1)–(3), that SSA's actions misled her; she had a physical, mental, educational or linguistic limitation(s) that prevented her from submitting the evidence earlier; or some other unusual, unexpected or

show that there is a reasonable probability that the evidence, alone or when considered with the other evidence in the record, would have changed the outcome of the case.  Accordingly, the AC's failure to amend the administrative record does not warrant reversal or allowance of Moore's motion to amend the administrative record.

### E.   Denial of Review by the Appeals Council

Generally, the discretionary decision of the AC to deny a request for review of an ALJ's decision is not reviewable as the "reversible error by an ALJ can be remedied by the Court regardless of what the Appeals Council did or did not do."   Marmol v. Astrue, No. 07–CV–297–S, 2008 WL 2831256, at *9 (D.R.I. July 22, 2008).  However, the First Circuit has held that review of the AC's decision is acceptable in cases "where new evidence is tendered after the ALJ decision."   Mills 244 F.3d at 5.  Accordingly, where new evidence has been submitted to the AC after the ALJ's decision, "an Appeals Council refusal to review the ALJ may be reviewable where it gives an egregiously mistaken ground for this action."  Id.  This standard for review has been described as "exceedingly narrow."  Harrison v. Barnhart, No. 06–CV–30005–KPN, 2006 WL 3898287, at *2 (D. Mass. Dec. 22, 2006).

Moore makes no strong argument as to why the AC's denial was based upon egregiously mistaken grounds and the circumstances here do not merit such a conclusion.  The "Notice of Appeals Council Action" states that the AC "found no reason under [their] rules to review the Administrative Law Judge's decision [and] [t]herefore, we have denied your request for review." R. 1.  The First Circuit has noted that the AC "need not and often does not give reasons" for its decisions to deny review.  Mills, 244 F.3d at 5; see also Waters v. Astrue, 495 F. Supp. 2d 512,

---

unavoidable circumstance beyond her control prevented her from submitting the evidence earlier.

514–515 (D. Md. 2007) (noting that failure of AC to explain how it evaluated new evidence presented to it does not automatically require remand).  Although, there is no explicit reference in the AC's notice that it rejected the new evidence that Moore submitted, the fact that the AC neither explicitly rejected nor accepted the evidence does not necessarily justify reversal or remand.  See Pluth v. Astrue, No. 09–CV–126–LSC, 2010 WL 2483281, at *10–11 (D. Neb. June 4, 2010) (concluding that lack of clarity as to whether the AC considered plaintiff's new evidence before denying review did not justify remand or reversal because even with the additional evidence "the ALJ's decision [remained] fully supported by the substantial evidence on the record").  The Court finds that the same is true here where, as discussed above, the post-ALJ decision medical records would not warrant a different result and the ALJ's decision was supported by substantial evidence.

    Any argument that the AC's action was improper because it used boilerplate language in denying review of the ALJ's decision also fails given the circumstances of this case.  Although some courts have held that the "egregious" standard is impossible to apply when the AC uses generic boilerplate language, others have held otherwise.  Compare Rosado, 340 F. Supp. 2d at 67–68 (remanding where AC's language that the new evidence "did not provide a basis for disturbing the ALJ's decision" was found to be so broad that egregiousness standard was impossible to apply and noting that a "cursory review" of the evidence proffered by the claimant to the AC revealed that it was new, material and perhaps contrary to the weight of the other evidence); with Thibodeau v. Astrue, No. 08-CV-308-JD, 2009 WL 903851, at *4, *5 n.6 (D.N.H. Mar. 31, 2009) (considering the AC's statements that it "considered the additional evidence" and "found that this information does not provide a basis for changing the [ALJ's]

decision" and concluding that although the AC used boilerplate language in denying review, its reasoning was sufficiently articulated to apply the <u>Mills</u> standard).  The Court finds that the <u>Mills</u> standard can be applied here and there was no egregious error.  Although the AC used boilerplate language, the Court finds, having reviewed the administrative record and the proffered new evidence from Moore, it to be true, as the AC said in its denial of review, that there was "no reason under [SSA's] rules" for the AC "to review the Administrative Law Judge's decision," R. 1, as the ALJ's conclusion that Moore was not disabled was supported by substantial evidence and the evidence that Moore submitted to the AC did not meet the standard for AC consideration as discussed above.

### F.     The Court Denies Remand

Pursuant to 42 U.S.C. § 405(g), district courts may remand a case to the Commissioner based on new, material evidence and good cause.  Sentence six of section 405(g) provides in relevant part that "[t]he court may . . . at any time order additional evidence to be taken before the [Commissioner], but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  Thus, remand is appropriate when "the district court learns of evidence not in existence or available to the claimant at the time of the administrative proceeding that might have changed the outcome of that proceeding."  <u>Miller</u>, 2011 WL 2462473, at *15 (quoting <u>Sullivan v. Finkelstein</u>, 496 U.S. 617, 626 (1990)) (internal quotation mark omitted); <u>accord</u> <u>Melkonyan v. Sullivan</u>, 501 U.S. 89, 98 (1991) (explaining that pursuant to 42 U.S.C. § 405(g), "the court remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome

of the prior proceeding").  To be considered "new," the evidence must have been unavailable during the administrative proceedings, which includes "action at the Appeals Council level." <u>Miller</u>, 2011 WL 2462473, at *15; <u>see</u> <u>Rosado</u>, 340 F. Supp. 2d at 67 n.1 (noting that "sentence six" of 42 U.S.C. § 405(g), only applies when the new evidence is proffered for the first time to the district court).  However, even if such evidence were "new" and had not been submitted below, remand under sentence six would still not be warranted since, for all of the reasons discussed above, the evidence would not have changed the outcome of the ALJ's decision.

For all these reasons, Moore is not entitled to a remand pursuant to 42 U.S.C. § 405(g).

## V.    Conclusion

Based on the foregoing, the Commissioner's motion to affirm is GRANTED and Moore's motions to amend the administrative record and reverse or remand are DENIED.

**So ordered.**

<u>/s/ Denise J. Casper</u>
United States District Judge